# BANK ONE CHICAGO, N. A. *v.* MIDWEST BANK & TRUST CO.

No. 94–1175.   Argued November 28, 1995—Decided January 17, 1996

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined, and in which SCALIA, J., joined in part. STEVENS, J., filed a concurring opinion, in which BREYER, J., joined, *post*, p. 276. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 279.

*Robert A. Long, Jr.,* argued the cause for petitioner. With him on the briefs were *Mark A. Weiss* and *Jeffrey S. Blumenthal.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Mark B. Stern,* and *Douglas B. Jordan.*

*Robert G. Epsteen* argued the cause for respondent. With him on the brief were *Alan H. Zenoff* and *A. J. Zenoff.**

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the Expedited Funds Availability Act, 12 U. S. C. §§4001–4010, a 1987 law designed to accelerate the availability of funds to bank depositors and to improve the Nation's check payment system. We confront a jurisdictional question regarding the Act's civil liability provisions, in particular §§4010(a), (d), and (f): Is federal-court subject-matter jurisdiction under those provisions confined to suits initiated by bank customers against banks, as the Court of Appeals held, or do federal courts have jurisdiction, as well, over suits brought by one bank against another depository institution? We hold that the Act provides for federal-court jurisdiction not only in suits between customers and banks, but also in cases initiated by one bank against another bank.

I

Historically, the Nation's check payment system has been controlled primarily by state law, particularly, in recent decades, by articles 3 and 4 of the Uniform Commercial Code (UCC). Although federal regulations have long supplemented state law in this area, see most notably Regulation J, 12 CFR pt. 210 (1995), the UCC has supplied the basic legal framework for bank deposits and check collections. But despite UCC controls, the check-clearing process too often lagged, taking days or even weeks to complete. To protect themselves against the risk that a deposited check would be returned unpaid, banks typically placed lengthy "holds" on deposited funds. Bank customers, encountering long holds, complained that delayed access to deposited funds

---

*Briefs of *amici curiae* urging reversal were filed for the Electronic Check Clearing House Organization by *Robert G. Ballen, Gilbert T. Schwartz,* and *Dina J. Moskowitz;* and for the New York Clearing House Association by *Philip L. Graham, Jr.,* and *Norman R. Nelson.*

impeded the expeditious use of their checking accounts. See S. Rep. No. 100–19, pp. 25–26 (1987).

In 1987, Congress responded by passing the Expedited Funds Availability Act (EFA Act or Act), 101 Stat. 635, as amended, 12 U. S. C. §§ 4001–4010. The Act requires banks [1] to make deposited funds available for withdrawal within specified time periods, subject to stated exceptions. See §§ 4002, 4003. To reduce banks' risk of nonpayment, the Act grants the Board of Governors of the Federal Reserve System (Federal Reserve Board or Board) broad authority to prescribe regulations expediting the collection and return of checks. § 4008. The Board and other banking agencies are authorized to enforce the Act's provisions administratively, by issuing cease-and-desist orders and imposing other civil sanctions. See § 4009(a) (incorporating administrative enforcement provisions of 12 U. S. C. § 1818).

The Act's final section contains civil liability provisions, which are the focus of this case. See § 4010. Subsection 4010(a) addresses a bank's liability to persons other than another depository institution. It provides, in pertinent part:

> "Except as otherwise provided in this section, any depository institution which fails to comply with any requirement imposed under this chapter or any regulation prescribed under this chapter with respect to any person other than another depository institution is liable to such person in an amount equal to the sum of [a specified measure of damages]."

Subsection 4010(f) governs a bank's liability to another bank for violation of the Act's provisions. It states:

> "The Board is authorized to impose on or allocate among depository institutions the risks of loss and liability in connection with any aspect of the [check] payment

---

[1] The EFA Act applies to "depository institution[s]," as that term is defined in 12 U. S. C. § 461(b)(1)(A). See 12 U. S. C. § 4001(12). For simplicity, we often use the term "bank" instead.

system . . . . Liability under this subsection shall not exceed the amount of the check giving rise to the loss or liability, and, where there is bad faith, other damages, if any, suffered as a proximate consequence of any act or omission giving rise to the loss or liability."

Subsection 4010(d) provides for concurrent federal-court and state-court jurisdiction over civil liability suits:

"Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year after the date of the occurrence of the violation involved."

The Federal Reserve Board has implemented the EFA Act through Regulation CC, 12 CFR pt. 229 (1995). Subpart C of Regulation CC contains rules to expedite the collection and return of checks. It requires banks, among other things, to return checks "in an expeditious manner," § 229.30(a); provide prompt notice of nonpayment of certain checks, § 229.33(a); and include in the notice the reason for nonpayment, § 229.33(b)(8). Section 229.38 states standards governing interbank liability. It instructs banks to "exercise ordinary care and act in good faith in complying with the requirements of [Subpart C]," and further prescribes (in relevant part): "A bank that fails to exercise ordinary care or act in good faith . . . may be liable to" other depository institutions. § 229.38(a). Section 229.38 repeats the jurisdictional provision Congress placed in 12 U. S. C. § 4010(d), i. e., the regulation provides for concurrent federal-court and state-court jurisdiction over "[a]ny action under this subpart." 12 CFR § 229.38(g) (1995).

## II

This controversy stems from an interbank dispute regarding a dishonored check. Petitioner Bank One Chicago sued respondent Midwest Bank & Trust Co. in Federal District Court, alleging that Midwest had failed to comply with its

obligations under Regulation CC. The facts underlying the suit are uncontested. A customer of Bank One deposited a check for $64,294.27 drawn on an account at Midwest. Bank One forwarded the check through the Federal Reserve System for collection, but Midwest returned it unpaid because Bank One's endorsement stamp was illegible. Bank One properly endorsed the check, resubmitted it for collection, and made the funds available to the Bank One customer. Midwest again returned the check unpaid, this time stating that the payor's account lacked sufficient funds to cover the check. By then, however, Bank One's customer had withdrawn most of the funds from its account. Bank One sought to recover the amount it paid out to its customer against funds that remain uncollected.

On cross-motions for summary judgment, the District Court ruled for Bank One. That court centrally determined: "Midwest did not act with ordinary care [when it] return[ed] the check for guarantee of endorsement without first checking the sufficiency of the funds in support of the check." App. to Pet. for Cert. 12. To satisfy the payor bank's obligation under 12 CFR § 229.38(a) (1995), the court explained, Midwest should have notified Bank One of the insufficient funds problem the first time Midwest returned the check. By failing to do so, the court concluded, Midwest had caused Bank One to lose $43,912.06. The court accordingly entered judgment for Bank One in that amount. App. to Pet. for Cert. 15. Midwest appealed.

The Court of Appeals for the Seventh Circuit did not reach the merits of the appeal. Instead, the appellate court raised at oral argument, on its own motion, a threshold question of subject-matter jurisdiction. After affording the parties an opportunity to file memoranda, the Court of Appeals vacated the judgment for Bank One and ordered the District Court to dismiss the action for lack of jurisdiction. *First Illinois Bank & Trust* v. *Midwest Bank & Trust Co.*, 30 F. 3d 64, 65 (1994).

Examining the civil liability provisions of 12 U. S. C. § 4010, the Court of Appeals concluded that the EFA Act provides for federal-court jurisdiction only when a "person other than [a] depository institution" sues a "depository institution," see 12 U. S. C. § 4010(a), *i. e.*, principally, when a depositor sues a bank. 30 F. 3d, at 65. "Disputes such as [Bank One's complaint against Midwest], between members of the Federal Reserve System," the Seventh Circuit stated, "are to be handled administratively before the Board of Governors of the Federal Reserve System . . . (or perhaps in state court)." *Ibid.* The court added, in response to a submission by the Federal Reserve Board: "Although the Board of Governors has informed us that no mechanism is currently available for administrative resolution of such [interbank] disputes, the Board's differing interpretation of this statute cannot confer jurisdiction upon the Court." *Ibid.*

We granted certiorari. 515 U. S. 1157 (1995). Satisfied that the District Court had adjudicatory authority in this case, we now reverse the judgment of the Court of Appeals.

### III

The Court of Appeals and the parties advance diverse readings of 12 U. S. C. § 4010. According to the Seventh Circuit, § 4010 authorizes original federal-court jurisdiction only in actions between a bank and a person other than a bank. Subsection 4010(a) alone, in the Court of Appeals' view, provides for rights immediately enforceable in federal court, and that subsection excludes interbank suits, for it applies only to "disputes between 'any depository institution' and 'any person other than another depository institution.'" 30 F. 3d, at 65 (quoting § 4010(a)). Although § 4010(f) provides for interbank liability, the Court of Appeals read that subsection to authorize only administrative adjudication. In the Seventh Circuit's words:

"The purpose of the [EFA] Act is to require banks to make funds available to depositors quickly. Thus the

depositors have rights, enforceable in court, while the banks have obligations, which the Federal Reserve Board may establish by regulation and enforce in administrative proceedings." *Ibid.*

The Court of Appeals did not say whether its reading of the statute encompassed an ultimate role for federal courts, as judicial reviewers of the Board's administrative adjudications.

Midwest agrees with the Seventh Circuit that § 4010(a) alone describes court-enforceable EFA Act rights—rights that depositors can assert against banks. But unlike the Court of Appeals, Midwest is uncertain whether § 4010(f) authorizes administrative adjudication by the Federal Reserve Board. See Tr. of Oral Arg. 33–34. Remaining neutral on the Board's competence as a forum for resolving controversies between private parties, Midwest urges that the issue before this Court "is not whether the Board may adjudicate the interbank dispute between petitioner and respondent," but whether "the EFA Act confers on the federal district court jurisdiction to decide this dispute." Brief for Respondent 23. In Midwest's view, Congress intended interbank disputes to be resolved primarily in state rather than federal courts. *Id.*, at 5–6.[2]

Both Bank One and the United States, as *amicus curiae*, agree with Midwest that state courts have jurisdiction over interbank check payment disputes. But Bank One and the United States maintain that § 4010(f), by providing for interbank "liability" up to the amount of the check as well as "other damages" in certain cases, authorizes interbank actions for violations of liability regulations prescribed by the

---

[2] Midwest observes that UCC § 4-103, 2B U. L. A. § 4-103 (1991), treats Federal Reserve Board regulations as "agreements" between participants in the check payment system; damages for violation of the terms of such agreements, Midwest further asserts, would be recoverable as a matter of state law. See, *e. g., United Postal Savings Assn.* v. *Royal Bank Mid-County,* 784 S. W. 2d 906 (Mo. App. 1990).

Federal Reserve Board. And they regard § 4010(d), which speaks of "[a]ny action under [§ 4010]," as instructing that suits under § 4010(f), as well as those under § 4010(a), "may be brought in any United States district court."

We hold that the District Court, in the instant case, correctly comprehended its adjudicatory authority, and that the Court of Appeals erred when it ordered dismissal of the action for lack of jurisdiction. The language of § 4010, reinforced by the title of the provision and its drafting history, impel reading both subsections (a) and (f) as authorizing claims for relief enforceable in federal court as prescribed in subsection (d).

## IV

Section 4010 is entitled "Civil liability"; its purpose is to afford private parties a claim for relief based on violations of the statute and its implementing regulations. Subsection (a) affords a claim for relief by making banks liable to "any person other than another depository institution." It refers to both individual and class actions, and specifies the measure of damages recoverable in such actions. All agree that suits described in subsection (a) may be brought in federal court under § 4010(d).

Subsection (f) governs the area of liability not covered by subsection (a): banks' liability *inter se.* It authorizes the Federal Reserve Board to "impose on or allocate among depository institutions the risks of loss and liability in connection with any aspect of the [check] payment system," and states that "[l]iability under this subsection" shall be limited to the amount of the check, except in cases involving bad faith. In our view, subsection (f), like subsection (a), provides a statutory basis for claims for relief cognizable in federal court under § 4010(d). Both subsections impose civil liability for violation of the EFA Act and its implementing regulations. Though the two prescriptions are not parallel—most prominently, subsection (f) vests the Board with authority to establish the governing liability standards—

they serve the same key purpose: Both permit recovery of damages caused by a regulated party's failure to comply with the Act.

The drafting history of § 4010 casts some light on the discrete composition and separate placement of subsections (a) and (f). Under the versions of the statute originally passed by each House of Congress, subsection (a) encompassed actions between banks and persons other than banks, as well as interbank actions. The Conference Committee narrowed subsection (a) by excluding interbank actions, but simultaneously inserted, still under the section heading "Civil liability," a new subsection (f). Compare H. R. Rep. No. 100–52, p. 10 (1987), and S. 790, 100th Cong., 1st Sess., § 609(a) (1987), with H. R. Conf. Rep. No. 100–261, pp. 105–106 (1987).

These changes reflect recognition that interbank disputes arising out of the check payment system may be more complex than those involving banks and depositors; such disputes, therefore, may warrant regulatory standards, set by an expert agency, to fill statutory interstices. Thus, in subsection (f), Congress delegated to the Federal Reserve Board authority to establish rules allocating among depository institutions "the risks of loss and liability" relating to the payment and collection of checks. 12 U. S. C. § 4010(f). Having conferred this authority on the Board, Congress sensibly consolidated in subsection (f) aspects of § 4010 that relate to interbank disputes—liability limits as well as rule-making authority.

Congress no doubt intended rules regarding interbank losses and liability to be developed administratively. But nothing in § 4010(f)'s text suggests that Congress meant the Federal Reserve Board to function as both regulator and adjudicator in interbank controversies. Rather, subsections (f) and (d) fit a familiar pattern: agency regulates, court adjudicates. See, e. g., Securities Act of 1933, 15 U. S. C. § 77j(c) (mandating compliance with disclosure requirements established by Securities and Exchange Commission); § 77k (creat-

ing right of action in "any court of competent jurisdiction" for violation of those requirements). As the United States persuasively contends: "Congress left it to the Board to determine the liability standards for losses in the inter-bank payment system because of the greater complexity of that subject, and not because Congress intended to create remedies that would be adjudicated in different fora." Brief for United States as *Amicus Curiae* 13.

We find implausible the Court of Appeals' interpretation of § 4010, under which interbank disputes would be "handled administratively" before the Federal Reserve Board. See 30 F. 3d, at 65. Our cases have not been quick to infer agency authority to adjudicate private claims. In *Coit Independence Joint Venture* v. *FSLIC*, 489 U. S. 561 (1989), for example, we held that the Federal Savings and Loan Insurance Corporation (FSLIC) lacked statutory authority to adjudicate creditors' claims against insolvent savings and loan associations. *Id.*, at 572. We observed in *Coit*, after examining the relevant statutory provisions, that "when Congress meant to confer adjudicatory authority on FSLIC it did so explicitly and set forth the relevant procedures in considerable detail." *Id.*, at 574.

Similarly, in *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219 (1995), we rejected American Airlines' argument that Congress intended the Department of Transportation (DOT) to serve as the exclusive adjudicator of air carrier contract disputes. *Id.*, at 230–232. We noted that the DOT had "neither the authority nor the apparatus required to superintend a contract dispute resolution regime," *id.*, at 232, and accordingly declined to "foist on the DOT work Congress has neither instructed nor funded the Department to do." *Id.*, at 234.

As in *Coit* and *Wolens*, we find no secure signal here that Congress intended to assign to the Federal Reserve Board responsibility for the adjudication of private claims. The

EFA Act's civil liability section, 12 U. S. C. § 4010, does not explicitly confer adjudicatory authority on the Board, nor "set forth the relevant procedures" for resolution of private disputes. See *Coit*, 489 U. S., at 574.[3] Section 4010, we stress, contrasts conspicuously with statutes in which Congress *has* given the Board adjudicatory authority. See, *e. g.*, Bank Holding Company Act of 1956, 12 U. S. C. § 1843(c)(8) (authorizing Board to determine whether bank holding company may acquire shares in nonbanking entity); § 1848 (providing for judicial review of such determinations); cf. Commodity Exchange Act, 7 U. S. C. § 18 (specifying detailed procedures governing adjudication of private disputes by the Commodity Futures Trading Commission).

Finally, we note that the interpretation of § 4010 offered by Bank One and the United States is a sensible one. All check-related claims arising out of the same transaction may be brought in a single forum—either in federal court (which would have supplemental jurisdiction over state-law claims, see 28 U. S. C. § 1367), or in state court. The reading of the statute proposed by the Seventh Circuit, in contrast, would yield an incoherent jurisdictional scheme. Bank-depositor claims would be adjudicated in one forum (state or federal court), while interbank claims under the EFA Act would originate in another (before the Federal Reserve Board). And interbank claims under state law would presumably have to be raised in a separate state-court proceeding. Even if the text of § 4010 could plausibly be read to create

---

[3] The Court of Appeals cited 12 U. S. C. § 4009(c)(1) as a potential source of the Board's authority to adjudicate private disputes. *First Illinois Bank & Trust* v. *Midwest Bank & Trust Co.*, 30 F. 3d 64, 65 (CA7 1994). But as the United States points out, that section merely authorizes the Board to use traditional administrative enforcement tools in securing compliance with the EFA Act. Brief for United States as *Amicus Curiae* 19. Section 4009(c) "does not create any mechanism for the adjudication of inter-bank civil liability claims." *Id.*, at 19–20.

this decidedly inefficient jurisdictional scheme, we would hesitate to attribute such a design to Congress.[4]

\* . \* \*

For the reasons stated, the judgment of the Court of Appeals for the Seventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

Given the fact that the Expedited Funds Availability Act was a measure that easily passed both Houses of Congress,[1] JUSTICE SCALIA is quite right that it is unlikely that more than a handful of legislators were aware of the Act's drafting history. He is quite wrong, however, to conclude from that observation that the drafting history is not useful to conscientious and disinterested judges trying to understand the statute's meaning.

Legislators, like other busy people, often depend on the judgment of trusted colleagues when discharging their official responsibilities. If a statute such as the Expedited Funds Availability Act has bipartisan support and has been carefully considered by committees familiar with the subject matter, Representatives and Senators may appropriately rely on the views of the committee members in casting their votes. In such circumstances, since most Members are content to endorse the views of the responsible committees, the

---

[4] Bank One and *amicus* New York Clearing House Association contend that 28 U. S. C. § 1331 provides an independent basis for federal-court jurisdiction here. Satisfied that Bank One properly relied on 12 U. S. C. § 4010, we need not and do not pass on this contention.

[1] The House passed the Act by a vote of 382 to 12. 133 Cong. Rec. 22110 (1987). The Senate approved the measure 96 to 2. *Id.*, at 22181.

intent of those involved in the drafting process is properly regarded as the intent of the entire Congress.

In this case, as the Court and JUSTICE SCALIA agree, *ante,* at 273–274, *post,* at 282, the statutory text of § 4010 supports petitioner's construction of the Act. However, the placement of the authorization for interbank litigation in subsection (f) rather than subsection (a) lends some support to the Court of Appeals' interpretation. When Congress creates a cause of action, the provisions describing the new substantive rights and liabilities typically precede the provisions describing enforcement procedures; subsection (f) does not conform to this pattern. The drafting history, however, provides a completely satisfactory explanation for this apparent anomaly in the text.

JUSTICE SCALIA nevertheless views the Court's reference to this history as unwise. As he correctly notes, the simultaneous removal of the provision for interbank liability from subsection (a) and the addition of a new subsection (f) support another inference favoring the Court of Appeals' construction of the statute: that the drafters intended to relegate the resolution of interbank disputes to a different tribunal. JUSTICE SCALIA is mistaken, however, in believing that this inference provides the "most plausible explanation" for the change, *ibid.* In my judgment the Court has correctly concluded that the most logical explanation for the change is a decision to consolidate the aspects of § 4010 that relate to interbank disputes—liability limits and rulemaking authority—in the same subsection. *Ante,* at 273. Thus, the net result of the inquiry into drafting history is to find the answer to an otherwise puzzling aspect of the statutory text.

I must also take exception to JUSTICE SCALIA's psychoanalysis of judges who examine legislative history when construing statutes. He confidently asserts that we use such history as a makeweight after reaching a conclusion on the

basis of other factors. I have been performing this type of work for more than 25 years and have never proceeded in the manner JUSTICE SCALIA suggests. It is quite true that I have often formed a tentative opinion about the meaning of a statute and thereafter examined the statute's drafting history to see whether the history supported my provisional conclusion or provided a basis for revising it. In my judgment, a reference to history in the Court's opinion in such a case cannot properly be described as a "makeweight." That the history *could* have altered my opinion is evidenced by the fact that there are significant cases, such as *Green* v. *Bock Laundry Machine Co.*, 490 U. S. 504 (1989), in which the study of history *did* alter my original analysis. In any event, I see no reason why conscientious judges should not feel free to examine all public records that may shed light on the meaning of a statute.

Finally, I would like to suggest that JUSTICE SCALIA may be guilty of the transgression that he ascribes to the Court. He has confidently asserted that the legislative history in this case and in *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597 (1991), supports a result opposite to that reached by the Court. While I do not wish to reargue the *Mortier* case, I will say that I remain convinced that a disinterested study of the entire legislative history supports the conclusion reached by the eight-Member majority of the Court. Even if his analysis in both cases is plausible, it is possible that JUSTICE SCALIA's review of the history in *Mortier* and in this case may have been influenced by his zealous opposition to any reliance on legislative history in any case. In this case, as in *Mortier*, his opinion is a fine example of the work product of a brilliant advocate.[2] It is the Court's opinion,

---

[2] Justice Jackson, whose opinion in *United States* v. *Public Util. Comm'n of Cal.*, 345 U. S. 295 (1953), JUSTICE SCALIA cites, was also a brilliant advocate. Like JUSTICE SCALIA, he recognized the danger of indiscriminate use of legislative history, but unlike JUSTICE SCALIA he also recognized that it can be helpful in appropriate cases. See *Schwegmann Brothers* v. *Calvert Distillers Corp.*, 341 U. S. 384, 395–396 (1951).

however, that best sets forth the reasons for reversing the judgment of the Court of Appeals.

JUSTICE BREYER has authorized me to say that he agrees with the foregoing views.

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I agree with the Court's opinion, except that portion of it which enters into a discussion of "[t]he drafting history of § 4010." *Ante*, at 273. In my view a law means what its text most appropriately conveys, whatever the Congress that enacted it might have "intended." The law *is* what the law *says*, and we should content ourselves with reading it rather than psychoanalyzing those who enacted it. See *United States* v. *Public Util. Comm'n of Cal.*, 345 U. S. 295, 319 (1953) (Jackson, J., concurring). Moreover, even if subjective intent rather than textually expressed intent were the touchstone, it is a fiction of Jack-and-the-Beanstalk proportions to assume that more than a handful of those Senators and Members of the House who voted for the final version of the Expedited Funds Availability Act, and the President who signed it, were, when they took those actions, aware of the drafting evolution that the Court describes; and if they were, that their actions in voting for or signing the final bill show that they had the same "intent" which that evolution suggests was in the minds of the drafters.

JUSTICE STEVENS acknowledges that this is so, but asserts that the intent of a few committee members is nonetheless dispositive because legislators are "busy people," and "most Members [of Congress] are content to endorse the views of the responsible committees." *Ante*, at 276. I do not know the factual basis for that assurance. Many congressional committees tend not to be representative of the full House, but are disproportionately populated by Members whose constituents have a particular stake in the subject matter— agriculture, merchant marine and fisheries, science and technology, etc. I think it quite unlikely that the House of Rep-

resentatives would be "content to endorse the views" that its Agriculture Committee would come up with if that committee knew (as it knows in drafting committee reports) that those views need not be moderated to survive a floor vote. And even more unlikely that the *Senate* would be "content to endorse the views" of the House Agriculture Committee. But assuming JUSTICE STEVENS is right about this desire to leave details to the committees, the very first provision of the Constitution forbids it. Article I, § 1, provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." It has always been assumed that these powers are nondelegable—or, as John Locke put it, that legislative power consists of the power "to make laws, . . . not to make legislators." J. Locke, Second Treatise of Government 87 (R. Cox ed. 1982). No one would think that the House of Representatives could operate in such fashion that only the broad outlines of bills would be adopted by vote of the full House, leaving minor details to be written, adopted, and voted upon only by the cognizant committees. Thus, if legislation consists of forming an "intent" rather than adopting a text (a proposition with which I do not agree), Congress cannot leave the formation of that intent to a small band of its number, but must, as the Constitution says, form an intent of the *Congress*. There is no escaping the point: Legislative history that does not represent the intent of the whole Congress is nonprobative; and legislative history that does represent the intent of the whole Congress is fanciful.

Our opinions using legislative history are often curiously casual, sometimes even careless, in their analysis of what "intent" the legislative history shows. See *Wisconsin Public Intervenor* v. *Mortier,* 501 U. S. 597, 617–620 (1991) (SCALIA, J., concurring). Perhaps that is because legislative history is in any event a makeweight; the Court really makes up its mind on the basis of other factors. Or perhaps it is

simply hard to maintain a rigorously analytical attitude, when the point of departure for the inquiry is the fairyland in which legislative history reflects what was in "the Congress's mind."

In any case, it seems to me that if legislative history is capable of injecting into a statute an "intent" that its text alone does not express, the drafting history alluded to in today's opinion should have sufficed to win this case for respondent. It shows that interbank liability was not merely *omitted* from subsection (a), entitled "Civil liability." It was *removed* from that subsection, *simultaneously with the addition of subsection (f)*, 12 U. S. C. § 4010(f), which gave the Federal Reserve Board power to "impose on or allocate among depository institutions the risks of loss and liability in connection with any aspect of the payment system" (language that is at least as compatible with adjudication as with rulemaking). Now if the only function of this new subsection (f) had been to give the Board *rulemaking* power, there would have been no logical reason to eliminate interbank disputes from the "Civil liability" subsection, whose basic prescription (banks are civilly liable for violations of the statute or of rules issued under the statute[1]) applies no less in the interbank than in the bank-customer context. Nor can the removal of interbank disputes from subsection (a) be explained on the ground that Congress had decided to apply different damages limits to those disputes. The former subsection (a), in both House and Senate versions, already provided varying damages limits for individual suits and class actions, see S. 790, 100th Cong., 1st Sess., § 609(a) (1987); H. R. Rep. No. 100–52, pp. 10–11 (1987), and it would have been logical to set forth the newly desired interbank variation there as well, leaving to the new subsection (f) only

---

[1] The Senate version of subsection (a) did not refer to violations of rules, see S. 790, 100th Cong., 1st Sess., § 609(a) (1987), but it was the House version of subsection (a), see H. R. Rep. No. 100–52, p. 10 (1987), which did specifically mention rules, that was retained.

the conferral of rulemaking authority. Or, if it were thought essential to "consolidate" all the details of interbank disputes in subsection (f), it would still not have been necessary to *specifically exclude* interbank disputes from the general "civil liability" pronouncement of subsection (a). The prologue of that subsection, "[e]xcept as otherwise provided in this section," would have made it clear that interbank civil liability was limited as set forth in subsection (f). The most plausible explanation for specifically excluding interbank disputes from the "Civil liability" subsection when subsection (f) was added—and for avoiding any reference to "civil liability" in subsection (f) itself—is an intent to commit those disputes to a totally different regime, *i. e.*, to Board adjudication rather than the normal civil-liability regime of the law courts.[2]

Today's opinion does not consider this argument, but nonetheless refutes it (in my view) conclusively. After recounting the drafting history, the Court states that *"nothing in § 4010(f)'s text* suggests that Congress meant the Federal Reserve Board to function as both regulator and adjudicator

---

[2] I have explained why the "consolidation" explanation developed by JUSTICE STEVENS, *ante*, at 277, does not ring true. Even if it did, however, it would not be accurate to say that the legislative history thus provides "the answer to an otherwise puzzling aspect of the statutory text," *ibid.* What JUSTICE STEVENS calls "the answer" (viz., the wish to consolidate all the interbank provisions in one section) is no more evident from the legislative history than it is from the face of the statute itself. Nothing in the legislative history says "we will consolidate interbank matters in a new subsection (f)"; JUSTICE STEVENS simply surmises, from the fact that the final text contains such consolidation, that consolidation was the reason for excluding interbank disputes from subsection (a). What investigation of legislative history has produced, in other words, is not an answer (*that*, if there is one, is in the *text*), but rather the puzzlement to which an answer is necessary: Why were interbank disputes eliminated from subsection (a) when subsection (f) was adopted? Being innocent of legislative history, I would not have known of that curious excision if the Court's opinion had not told me. Thus, legislative history has produced what it usually produces: more questions rather than more answers.

in interbank controversies." *Ante*, at 273 (emphasis added). Quite so. The text's the thing. We should therefore ignore drafting history without discussing it, instead of after discussing it.