948 So.2d 599 (2006)
GULFSTREAM PARK RACING ASSOCIATION, INC., etc., Appellant,
v.
TAMPA BAY DOWNS, INC., etc., et al., Appellees.
No. SC05-251.
Supreme Court of Florida.
September 21, 2006.
*600 Keith E. Rounsaville of Akerman Senterfitt, Orlando, FL, for Appellant/Cross-Appellee Gulfstream Park Racing Association, Inc.
James M. Landis and Jon P. Tasso of Foley & Lardner LLP, Tampa, FL, for Appellees Jacksonville Greyhound Racing, Inc., Florida Jai-Alai, Inc., and Investment Corporation of Palm Beach.
Harold F.X. Purnell of Rutledge, Ecenia, Purnell & Hoffman, P.A., Tallahassee, FL, for Appellees Daytona Beach Kennel Club, Inc., Sports Palace, Inc., Hartman-Tyner, Inc., West Flagler Associates, Ltd., Southwest Florida Enterprises, Inc., St. Petersburg Kennel Club, Inc. and Associated Outdoor Clubs, Inc., Sanford-Orlando Kennel Club, Inc., Washington County Kennel Club, Inc., and Sarasota Kennel Club, Inc.
David T. Knight, Marie A. Borland and Lara J. Tibbals of Hill Ward & Henderson, P.A., Tampa, FL, for Appellee/Cross-Appellant Tampa Bay Downs, Inc.
LEWIS, C.J.
We have for review the following question of Florida law certified by the United States Court of Appeals for the Eleventh Circuit that is determinative of a cause pending in that court and for which there appears to be no controlling precedent from this Court:
DOES THE FLORIDA PARI-MUTUEL WAGERING ACT PROHIBIT AN AGREEMENT BETWEEN A FLORIDA THOROUGHBRED RACETRACK AND AN OUT-OF-STATE RACETRACK THAT GRANTS THE FLORIDA RACETRACK THE EXCLUSIVE RIGHT TO DISSEMINATE THE OUT-OF-STATE TRACK'S SIMULCAST SIGNAL TO OTHER FLORIDA WAGERING SITES PERMITTED TO RECEIVE THEM?
Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc., 399 F.3d 1276, 1279 (11th Cir.2005). We have jurisdiction. See art. V, § 3(b)(6), Fla. Const. In order to fully address the issues presented for consideration, we answer the certified question in two steps: (1) whether Florida law permits an agreement which restricts a Florida thoroughbred track which receives out-of-state simulcast signals from disseminating those signals to other Florida pari-mutuel venues; and (2) whether Florida law permits an agreement that would restrict a Florida non-thoroughbred *601 track from conducting intertrack wagering on those signals.

FACTS AND PROCEDURAL HISTORY
This is a dispute between competing pari-mutuel venues. Florida has an extensive pari-mutuel industry, consisting of a variety of venues, including thoroughbred racetracks, harness racetracks, jai alai frontons, and greyhound tracks. Chapter 550 of the Florida Statutes, Florida's Pari-mutuel Wagering Act ("Wagering Act"), regulates most aspects of the pari-mutuel wagering industry in this state. See ch. 550, Fla. Stat. (2005).
The specific aspect of the pari-mutuel industry at issue in the instant matter is a type of wagering known as "intertrack wagering." An individual who visits a pari-mutuel venue may place bets at that location both on races occurring live at that venue and also on races occurring at other venues which are broadcast live at the wagering location.[1] These off-site races occur live either at other in-state venues or at out-of-state venues. Wagers on any race not occurring live at the venue accepting the wager are known as "intertrack wagers." Signals of live races occurring at out-of-state venues transmitted to Florida pari-mutuel venues, as well as signals of live races occurring at in-state venues transmitted to out-of-state venues, are known as "simulcast signals." In addition to Florida's Wagering Act, wagering on simulcast signals with interstate implications is also impacted by the federal Interstate Horseracing Act, 15 U.S.C. §§ 3001-3007 (2000) ("IHA").
Florida's Wagering Act dictates that a simulcast signal from an out-of-state thoroughbred racetrack can only be directly received by an in-state thoroughbred racetrack which is conducting live races. See § 550.3551(5), Fla. Stat. (2005). Currently, there are only four thoroughbred racetracks in Florida that qualify to receive these simulcast signals directly from out-of-state thoroughbred tracks. The remaining pari-mutuel venues (e.g., greyhound tracks and jai alai frontons) must contract with one of these four thoroughbred tracks to receive[2] and conduct wagering on these thoroughbred races occurring live at out-of-state locations. It is the competition with regard to disseminating *602 these simulcast signals to the non-thoroughbred Florida pari-mutuel venues and the correlating revenue such agreements generate that drive the issue in the instant matter.
The Federal IHA removes competition with regard to many of these non-thoroughbred venues by requiring that a pari-mutuel venue within sixty miles of a thoroughbred track must obtain the approval of that particular thoroughbred track before accepting wagers on any simulcast signals of thoroughbred races. See 15 U.S.C. § 3004(b)(1)(A) (2000). This federal statutory requirement, coupled with the Florida Wagering Act's dictate that non-thoroughbred venues must contract with only thoroughbred venues to receive simulcast signals from out-of-state thoroughbred tracks, creates a situation in which a thoroughbred track within sixty miles of a non-thoroughbred pari-mutuel facility can require the non-thoroughbred venue to contract with only it, and not another Florida thoroughbred track, to receive simulcast signals of thoroughbred races occurring live at out-of-state venues. Twelve of the twenty-six non-thoroughbred pari-mutuel venues in Florida are located within sixty miles of one of the four thoroughbred tracks. Thus, those twelve venues must contract with this single nearest thoroughbred track which is conducting live races to receive and conduct wagering on simulcast signals of out-of-state thoroughbred races. The remaining fourteen non-thoroughbred pari-mutuel venues, however, are free to contract with any Florida thoroughbred track for access to these simulcast signals.
Originally, the Florida Wagering Act restricted wagering on simulcast signals. In 1996, however, the Florida Legislature amended the Wagering Act to allow "full-card" (unlimited) simulcasting. See ch. 96-364, § 11, at 2085, Laws of Fla. After the Wagering Act was amended, Gulfstream Park Racing Association, a thoroughbred track located in South Florida and appellant in the instant action, began to enter into exclusive dissemination agreements with out-of-state thoroughbred tracks for these signals. Language in these exclusive agreements obligated the out-of-state track, in exchange for Gulfstream agreeing to receive and disseminate the simulcast signals from these out-of-state facilities in the lucrative South Florida market, to restrict the dissemination rights it granted any other Florida thoroughbred track receiving the same out-of-state simulcast signal to pari-mutuel venues within sixty miles of that track. In other words, the agreements were designed to grant Gulfstream the exclusive rights to contract with the fourteen non-thoroughbred pari-mutuel venues that are not within sixty miles of any thoroughbred track for delivery of and access to the simulcast signals of these out-of-state thoroughbred tracks. Once these exclusive agreements were in place, Tampa Bay Downs ("TBD"), a thoroughbred track and appellee in the instant action, was accordingly restricted by provisions included in its contracts with these out-of-state thoroughbred tracks, in conformity with the out-of-state track's obligations under its own contract with Gulfstream, from disseminating the simulcast signals it received from these out-of-state tracks to any non-thoroughbred pari-mutuel venues outside a sixty-mile radius of TBD.
In May of 2002, TBD filed a petition with the Florida Division of Pari-Mutuel Wagering ("DPW") seeking a determination of whether these exclusive dissemination agreements with Gulfstream violated Florida law. On September 14, 2002, the DPW issued a declaratory statement finding that the exclusive agreements did violate Florida law. The declaratory statement indicated that the exclusive *603 agreements violated the clear dictates of section 550.6305(9)(g)(1), relating to simulcast signals, but specifically stated that "[n]othing in this declaratory statement should be construed as a statement by the Division that Gulfstream Park has, in fact, violated section 550.615(3) [relating to intertrack wagering in general]." Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc., 294 F.Supp.2d 1291, 1298 (M.D.Fla.2003) (quoting declaratory statement).
After the DPW issued its declaratory statement, TBD began contracting with non-thoroughbred pari-mutuel venues beyond the sixty-mile radius of TBD to disseminate simulcast signals of thoroughbred races occurring live out-of-state to these non-thoroughbred facilities, contrary to the exclusivity agreements held by Gulfstream. These agreements included venues for which Gulfstream would have otherwise had exclusive dissemination rights under the contracts with the out-of-state tracks. In response, Gulfstream sued TBD in federal district court seeking a declaratory judgment that Gulfstream's exclusive dissemination agreements with the out-of-state tracks were valid and enforceable under state law. Gulfstream, 399 F.3d at 1278. TBD filed a motion for summary judgment, asserting that sections 550.615(3) and 550.6305(9)(g)(1) of the Florida Wagering Act prohibited such agreements. Id. Although no state court had decided whether such exclusive agreements violated the Wagering Act, the federal district court held that the plain language of the Wagering Act did prohibit such agreements and, therefore, entered summary final judgment in favor of TBD. Id. Gulfstream sought review of the summary judgment in the United States Court of Appeals for the Eleventh Circuit, and this certified question has followed.

ANALYSIS

Restrictions on Dissemination
Section 550.6305(9)(g)(1) of the Florida Statutes requires:
Any thoroughbred permitholder which accepts wagers on a simulcast signal must make the signal available to any permitholder that is eligible to conduct intertrack wagering under the provisions of [this act].
§ 550.6305(9)(g)(1), Fla. Stat. (2005). Tampa Bay Downs receives simulcast signals from out-of-state tracks and accepts wagers on the races contained in those signals. Under the clear dictates of section 550.6305(9)(g)(1), TBD "must make the[se] signal[s] available to any permitholder eligible to conduct intertrack wagering." Id. To the extent that Gulfstream, pursuant to the terms of the exclusive dissemination agreements, attempts to prevent TBD from making these simulcast signals available to eligible intertrack wagering facilities, such action clearly collides and interferes with the obligations of TBD under this statutory provision. Therefore, we conclude that section 550.6305(9)(g)(1) of Florida's pari-mutuel statutory scheme prohibits enforcement of the provisions in Gulfstream's exclusive dissemination agreements that would operate to prevent TBD from complying with this statutory requirement.
In addition to the plain meaning of section 550.6305(9)(g)(1), the DPW's declaratory statement also supports TBD's assertion that the exclusivity provisions of Gulfstream's exclusive dissemination agreements violate Florida law by attempting to prohibit any dissemination by TBD of out-of-state simulcast signals. As the federal district court correctly reasoned, "[i]n Florida, courts give great deference to the interpretation of a statute by an administrative agency charged with *604 the statute's enforcement." Gulfstream, 294 F.Supp.2d at 1300 (citing Donato v. Am. Tel. & Tel. Co., 767 So.2d 1146, 1153-54 (Fla.2000)). The DPW concluded that section 550.6305(9)(g)(1) requires TBD to make the simulcast signals that it receives and upon which intertrack wagers are conducted available to other pari-mutuel facilities in the state. With this plain meaning application of section 550.6305(9)(g)(1) and recognition of the declaratory statement issued by the DPW, based exclusively upon an analysis of this statutory provision, the answer to the certified question would be in the affirmative. However, we must also address other applicable statutory provisions.

Restrictions on Intertrack Wagering on Simulcast Signals
Although we conclude that section 550.6305(g)(1) unambiguously dictates that Gulfstream cannot prevent TBD from making simulcast signals from out-of-state thoroughbred tracks on which it accepts wagers available to other Florida pari-mutuel venues, the next issue we must address in this litigation is whether Gulfstream's contracts can be used to prevent TBD from contracting with the pari-mutuel venues to which it disseminates the simulcast signals to allow these other venues to accept intertrack wagers on these simulcast signals. Contractual provisions in Gulfstream's exclusive dissemination agreements also attempt to grant Gulfstream the right to prevent other pari-mutuel venues from engaging in intertrack wagers on the simulcast signals disseminated by TBD, which provides a monetary impact to the present dispute. TBD asserts that the DPW's declaratory statement also supports the premise that section 550.615(3) of the Florida Statutes prohibits enforcement of these restrictions in the agreements. However, our review of the declaratory statement reveals that this assertion is without support.
While the DPW stated in the declaratory statement that an agreement which operates to prohibit TBD from rebroadcasting these simulcast signals violates both sections 550.615(3) and 550.6305(9)(g)(1) of Florida's Wagering Act, the declaratory statement expressly declined to find that Gulfstream violated section 550.615(3) of the Florida Statutes. See Gulfstream, 294 F.Supp.2d at 1298. While we recognize that the DPW's interpretation is entitled to great deference, the construction of the Wagering Act in the declaratory statement expressly invalidated Gulfstream's exclusive agreements on the basis that the agreements restricted TBD's right to disseminate simulcast signals only. It did not, however, address whether an agreement which would allow TBD to disseminate simulcast signals, but prohibit the venues receiving such signals from conducting intertrack wagering on those signals, would also violate the Wagering Act. Therefore, DPW's declaratory statement impacts only one element of the certified question. However, our analysis of section 550.615(3) leads us to conclude that the statutory provision does, in fact, prohibit enforcement of the provisions in the exclusive agreements which would restrict the right of TBD to contract with other pari-mutuel venues to allow those venues to conduct intertrack wagering on the simulcast signals disseminated by TBD.
Section 550.615(3) states:
If a permitholder elects to broadcast its signal to any permitholder in this state, any permitholder that is eligible to conduct intertrack wagering under the provisions of [this act] is entitled to receive the broadcast and conduct intertrack wagering under this section. . . .
*605 § 550.615(3), Fla. Stat. (2005). We have stated that normally, "[w]hen the language of [a] statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction." McLaughlin v. State, 721 So.2d 1170, 1172 (Fla.1998) (quoting Holly v. Auld, 450 So.2d 217, 219 (Fla.1984)). Gulfstream asserts that reference to the "signal" of a "permitholder" in section 550.615(3) restricts the application of that section to only intrastate signals of live races taking place at Florida pari-mutuel facilities and does not address simulcast signals from out-of-state tracks. Gulfstream further contends that because the word "its" modifies the word "signal," the signal must be only one owned by a Florida permitholder and, therefore, "its signal" does not include simulcast signals of out-of-state racetracks which are owned by the out-of-state facility conducting the live race. If, as Gulfstream contends, the language of the statute is clearly limited to broadcasts of races occurring live in-state and without ambiguity, TBD's assertion that the Court should look beyond the language of the statute to construe the terms is inappropriate. See McLaughlin, 721 So.2d at 1172. However, we conclude that the term "its signal" in the statutory context is not entirely unambiguous.
We have stated that "[t]he title [of a statute] is more than an index to what the section is about or has reference to; it is a direct statement by the legislature of its intent." State v. Webb, 398 So.2d 820, 825 (Fla.1981) (citing Berger v. Jackson, 156 Fla. 251, 23 So.2d 265 (1945)). The title of section 550.615 is "intertrack wagering." See § 550.615, Fla. Stat. (2005). The definitions section of the Wagering Act defines an "intertrack wager" as
a particular form of pari-mutuel wagering in which wagers are accepted at a permitted, in-state track, fronton, or pari-mutuel facility on a race or game transmitted from and performed live at, or simulcast signal rebroadcast[3] from, another in-state pari-mutuel facility.
§ 550.002(17), Fla. Stat. (2005). If we were to conclude that the section has application to only signals of live races occurring at in-state facilities, the phrase "or simulcast signal rebroadcast from . . . another in-state pari-mutuel facility" in the definition of intertrack wager would be rendered totally redundant and without meaning because the words would simply refer to the same type of wager already clearly described in other language in the same statutory provision. A live race occurring at an in-state facility which is broadcast to another in-state facility is encompassed in the language "a race or game transmitted from and performed live at . . . another in-state pari-mutuel facility" in the definition of "intertrack wagering." Id. If the language pertaining to the "rebroadcast of simulcast signals" also refers only to signals of live races transmitted from in-state facilities, as Gulfstream argues, this language adds absolutely nothing to the meaning of the statute, *606 contrary to accepted rules of statutory construction. We have noted:
It is an elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage.
Hechtman v. Nations Title Ins. of N.Y., 840 So.2d 993, 996 (Fla.2003) (citing Hawkins v. Ford Motor Co., 748 So.2d 993 (Fla.1999)). This principle dictates that the language pertaining to a "rebroadcast of simulcast signals" must be given some independent meaning and field of operation.
"Simulcasting" is defined in the pari-mutuel act as "broadcasting events occurring live at an in-state location to an out-of-state location, or receiving at an in-state location events occurring live at an out-of-state location" through various methods. § 550.002(32), Fla. Stat. (2005). It is logical to conclude that the language in the definition of "intertrack wagering" pertaining to "simulcast signal[s] rebroadcast from . . . another in-state pari-mutuel facility" includes the current method of disseminating simulcast signals of out-of-state thoroughbred races that is at issue in the instant matter. See § 550.002(17), Fla. Stat. (2005). The words "its signal" in section 550.615(3) are intended to include a simulcast signal of a race occurring live at an out-of-state location if an in-state facility disseminates that signal to other in-state facilities. At the very least, this interpretation creates ambiguity as to the meaning of the words "its signal" in section 550.615(3).
If the meaning of a statutory provision is deemed ambiguous, it must be subject to judicial construction. See Blanton v. City of Pinellas Park, 887 So.2d 1224, 1230 (Fla.2004) ("[I]f the statutory language is ambiguous . . . `the Court must resort to traditional rules of statutory construction to determine legislative intent.'") (quoting Palm Beach County Canvassing Bd. v. Harris, 772 So.2d 1273, 1282 (Fla. 2000)). This Court has stated that "[s]tatutes are construed to effectuate the intent of the legislature in light of public policy." White v. Pepsico, Inc., 568 So.2d 886, 889 (Fla.1990). The legislative history of the 1996 bill which permitted full-card simulcasting and precipitated Gulfstream's exclusive dissemination agreements sheds some light on the legislative intent with regard to intertrack wagering on simulcast signals being disseminated to in-state facilities.
The Final Bill Analysis and Economic Impact Statement completed by the House Committee on Regulated Industries first explained the "conditions for intertrack wagering" to be:
Any eligible Horse racing permitholder may, at any time, accept the signal from any other Horse racing permitholder in the state. Any eligible greyhound or jai alai permitholder may, at any time, receive broadcasts of any class of pari-mutuel race or game conducted by any licensed permitholder in the state. Any class of permitholder may elect to make its signal available for intertrack wagering. If a permitholder elects to broadcast its signal, it must make that signal available to any eligible permitholder. No person may attempt to restrain a permitholder from sending or receiving ITW broadcasts.
Fla. H.R. Comm. on Reg'd Indus., CS for HB 337 (1996) Staff Analysis at 3 (final June 10, 1996) (available at Fla. Dept. of State, Fla. State Archives, ser. 19, carton 2779, Tallahassee, Fla.) (hereinafter "Committee Report"). The Committee Report's reference to "broadcasts of any class of pari-mutuel race or game conducted by any licensed permitholder in the state" *607 implies that "its signal" to which the requirements of the statute apply is, as Gulfstream asserts, the signal of an in-state facility broadcasting live races "conducted by" that facility. Id.
The Committee Report, however, further addressed intertrack wagering on simulcast signals "rebroadcast" from an in-state facility and stated:
A unique situation arises when a Horse racing permitholder accepts a simulcast signal from an out-of-state facility and then rebroadcasts that signal to other pari-mutuel permitholders within this state. Horse racing permitholders may ". . . broadcast such out-of-state races to any guest track and accept wagers thereon in the same manner as is provided in [the simulcasting provisions of the Florida pari-mutuel code.]" The division refers to such activity as "intertrack wagering of simulcast," or "ISW." In such case, the purse payments and guest track payments otherwise applicable to [intertrack wagering] do not apply.
Id. at 5 (alteration in original). While the useful term "intertrack wagering of simulcast" does not appear in the Wagering Act, some information on legislative intent can be gleaned from this committee statement. First, the statement makes clear that wagering on simulcast signals "rebroadcast" from in-state tracks is a form of intertrack wagering. This supports the assertion that these are the types of wagers referenced in the statutory definition of "intertrack wagering" which includes "simulcast signal[s] rebroadcast from . . . another in-state pari-mutuel facility." § 550.002(17), Fla. Stat. (2005). Additionally, the statement that "purse payments and guest track payments otherwise applicable to [intertrack wagering] do not apply" to these wagers at least implies that the other conditions of intertrack wagering mentioned in the statute do apply. If intertrack wagers on simulcast signals were intended to be excepted from all of the statutory requirements of intertrack wagers, the Committee Report arguably would have made a statement to this effect, rather than only mentioning exceptions from purse and guest track payments. Under this reasoning, the statutory requirement that an in-state facility which "elect[s] to make its signal available for intertrack wagering . . . must make that signal available to any eligible permitholder," Committee Report at 3, would apply to intertrack wagering of simulcast. See § 550.615(3), Fla. Stat. (2005). Similarly, the statement in section 550.615(3) that pari-mutuel facilities receiving these signals are permitted to conduct intertrack wagering on those signals would likewise apply to disseminated simulcast signals.
This construction of section 550.615(3) also provides consistency with the unambiguous language in section 550.6305(9)(g)(1), which requires that pari-mutuel facilities accepting wagers on simulcast signals make those signals available to other pari-mutuel venues. A construction of the pari-mutuel act which would require these simulcast signals to be made available but also allow prohibition of intertrack wagering on those signals once received would render the requirement that those signals be made available illogical. Pari-mutuel venues would have no interest in receiving these simulcast signals if they could not conduct intertrack wagering with regard to the signal. Therefore, we conclude that enforcement of the exclusive agreements involved in the instant action is also prohibited by section 550.615(3), and this analysis also supports and causes the answer to the certified question to be in the affirmative.

Federal Preemption
Although not phrased precisely in these terms, Gulfstream essentially asserts that, by including a requirement that simulcast *608 signals from out-of-state venues comply with the IHA in section 550.3551(3)(a), the Florida Legislature recognized that the IHA preempts Florida's otherwise vast police power to regulate gambling within the state. See § 550.3551(3)(a), Fla. Stat. (2005) ("All broadcasts of horseraces received from locations outside this state must comply with the provisions of the Interstate Horseracing Act. . . ."). This Court has stated that "[t]he doctrine of preemption which is given effect through the supremacy clause mandates that federal law overrides any state regulation where there is an actual conflict between the two sets of legislation such that both cannot validly stand." Dep't of Revenue v. Wardair Canada, Ltd., 455 So.2d 326, 328 (Fla.1984), aff'd, 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986). While it is true that federal legislation could preempt Florida's ability to regulate intertrack wagering on simulcast signals that have entered interstate commerce, we conclude that the IHA neither preempts nor was intended to preempt Florida's regulation of the purely intrastate dissemination of simulcast signals.
In section 3001(a)(1) of the IHA, the first provision of the Act, "Congress finds that . . . the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1) (2000). In regulating the "limited area of interstate off-track wagering," the IHA simply requires a written contract between the facility conducting the race and transmitting the simulcast signal and the facility receiving the simulcast signal. See 15 U.S.C. §§ 3001(a)(3), 3004(a) (2000). As TBD advances, the IHA does not specify what terms must or even may be included in that written contract. To the extent that Florida law may restrict enforcement of the terms of exclusivity in agreements with respect to the dissemination of simulcast signals within the state, it does not appear that the federal and state regulations conflict. Compliance with the requirements of both the IHA and Florida's Wagering Act is possible because there is no actual conflict between the two statutory schemes. Under these circumstances, the federal statute does not preempt the state regulation. See Wardair Canada, 455 So.2d at 328. While an out-of-state facility may establish the terms of receipt of a simulcast signal by an in-state facility in accordance with the IHA, that facility may not require that the signal be redistributed in Florida in a manner which violates Florida's Wagering Act.

CONCLUSION
In summary, we conclude that provisions of agreements which purport to restrict a Florida thoroughbred track receiving and conducting wagering on out-of-state thoroughbred simulcast signals from either disseminating those signals to other Florida pari-mutuel venues or from contracting with those other venues to allow intertrack wagering on those simulcast signals violate the requirements of Florida's Wagering Act. Additionally, we conclude that provisions in Florida's Wagering Act which dictate that restrictive provisions in such agreements are impermissible are not preempted by the federal Interstate Horseracing Act. We have attempted to ascertain the intent of our Legislature and give independent meaning and effect to the words selected for this legislation. Accordingly, we answer the certified question in the affirmative and return this case to the United States Court of Appeals for the Eleventh Circuit for further proceedings.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, QUINCE and BELL, JJ., concur.
CANTERO, J., specially concurs with an opinion.
*609 CANTERO, J., specially concurring.
I concur in all aspects of the majority opinion except for its brief, and I believe unnecessary, reliance on a legislative staff analysis. Majority op. at 607. For the reasons stated in my opinion in American Home Assurance Co. v. Plaza Materials Corp., 908 So.2d 360, 371-78 (Fla.2005) (Cantero, J., concurring in part and dissenting in part), and summarized here, I believe that staff analyses are unreliable indicators of legislative intent. In this case in particular, the majority correctly interprets the plain language of sections 550.615(3) and 550.6305(9)(g)(1), Florida Statutes (2004), as well as their interplay with the definitions of "intertrack wager" and "simulcasting" in sections 550.002(17) and 550.002(32), Florida Statutes (2004). As the majority concludes, reading those provisions together, Gulfstream Park cannot restrict any thoroughbred race track, such as Tampa Bay Downs, from contracting with pari-mutuel venues to which it disseminates out-of-state simulcast signals to accept intertrack wagers. I agree with the majority's interpretation of those statutes, as well as its deference to the declaratory statement issued by the Division of Pari-Mutuel Wagering. I do not agree, however, that the legislative staff analysis the majority cites helps determine the legislative intent.
As I stated in my concurring opinion in American Home Assurance, "this kind of analysis is `neither compatible with our judicial responsibility of assuring reasoned, consistent, and effective application of the statutes . . ., nor conducive to a genuine effectuation of [legislative] intent.'" 908 So.2d at 375 (Cantero, J., concurring in part and dissenting in part) (quoting Blanchard v. Bergeron, 489 U.S. 87, 99, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (Scalia, J., concurring in part and concurring in the judgment)). Staff analyses are unreliable for several reasons. First, they are written by employees rather than the officials elected to write the laws, and thus they provide limited evidence of the legislators' intent. Id. at 376 (citing Foreman v. United States, 26 Cl.Ct. 553, 562 (Cl.Ct. 1992), aff'd, 60 F.3d 1559 (Fed.Cir.1995)). Second, "no evidence exists that any of the legislators who voted for the proposed bill even read the analysis, much less agreed with it." Id. Third, the staff analysis the majority cites came from only one house of the Legislature, see majority op. at 606-07, and "again no evidence exists that the other house adopted it, agreed with it, or even read it." American Home Assurance, 908 So.2d at 376. Legislators could disagree with the staff analysis and still vote in favor of the bill. Id. (citing Bank One Chicago, N.A. v. Midwest Bank & Trust Co., 516 U.S. 264, 280, 116 S.Ct. 637, 133 L.Ed.2d 635 (Scalia, J., concurring in part and concurring in the judgment)).
For these reasons, I concur in the majority opinion except for its reliance on a staff analysis in determining legislative intent.
BELL, J., concurs.
NOTES
[1] Although the definition section of Florida's Wagering Act defines the term more broadly, for the sake of clarity, the term "broadcast," as used in this opinion, is intended to encompass the transmission of a signal which contains a live race directly from the venue conducting the live race depicted in that signal. For example, when an in-state facility receives an out-of-state simulcast signal directly from the out-of-state facility conducting the live race depicted in that signal, the out-of-state track "broadcasts" that signal to the in-state facility.
[2] At the time the statutory provisions with regard to intertrack wagering were enacted, Florida non-thoroughbred pari-mutuel venues received out-of-state simulcast signals of thoroughbred races through a process called rebroadcasting. The out-of-state thoroughbred tracks would broadcast their simulcast signals to a Florida thoroughbred track through cable lines, and the Florida thoroughbred track would rebroadcast the signal to the in-state non-thoroughbred pari-mutuel venues through additional cable lines. Advances in technology subsequent to the passage of the statutory scheme have resulted in a switch to satellite transmission of simulcast signals. Currently, out-of-state thoroughbred tracks transmit simulcast signals through satellite. The Florida thoroughbred tracks access the satellite signal through the use of a decoding device. After the non-thoroughbred pari-mutuel facilities have contracted with the Florida thoroughbred track for access to the simulcast signal, the non-thoroughbred pari-mutuel facilities access the same satellite signal using a similar decoding device. Therefore, the simulcast signals are no longer physically rebroadcast from the Florida thoroughbred facility to the Florida non-thoroughbred pari-mutuel venues.
[3] The statutory sections and legislative history both contain references to rebroadcasting. As explained in note 2, supra, simulcast signals are no longer rebroadcast from in-state thoroughbred tracks. However, pursuant to the statutory requirement that a Florida non-thoroughbred pari-mutuel facility contract with a Florida thoroughbred track for access to simulcast signals of out-of-state thoroughbred races, Florida thoroughbred tracks continue to serve as a conduit through which in-state non-thoroughbred facilities gain access to simulcast signals of out-of-state thoroughbred races. Accordingly, when discussing the references in the statutory sections and the legislative history to rebroadcasting, the term "rebroadcast" will be used. However, in acknowledging that rebroadcasting no longer occurs, we refer to the current distribution method as "dissemination."