# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 24, 2007　　　Decided January 15, 2008

No. 06-5199

NATIONAL MINING ASSOCIATION,
APPELLANT

v.

DIRK KEMPTHORNE, SECRETARY OF THE INTERIOR, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 00cv00283)

---

*Kirsten L. Nathanson* argued the cause for appellant. With her on the briefs were *Harold P. Quinn, Jr.* and *Thomas C. Means*. *Joseph M. Klise* entered an appearance.

*Blair M. Gardner* was on the brief for amicus curiae National Council of Coal Lessors, Inc. in support of appellant.

*Kathryn E. Kovacs*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With her on the brief was *Robert Oakley*, Attorney.

*Walton D. Morris, Jr.* was on the brief for appellee Kentucky Resources Council, Inc.

Before: GARLAND and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The Secretary of the Interior has interpreted the phrase "valid existing rights" in the Surface Mining Control and Reclamation Act to foreclose surface mining operations in sensitive areas. The National Mining Association challenges this reading of the statute, but we conclude that we must defer to the Secretary's reasonable interpretation of this ambiguous phrase.

## I.

In 1977, Congress enacted the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201 *et seq.*, "to protect society and the environment from the adverse effects of surface coal mining operations," *id.* § 1202(a). Section 522(b) of the SMCRA authorizes the Secretary of the Interior ("Secretary") to prohibit surface coal mining operations on federal lands if he determines them to be unsuitable for that purpose. *Id.* § 1272(b). Section 522(e) bans outright surface mining in statutorily designated areas.[1] *Id.*

---

[1] Subject to certain exceptions, § 522(e) designates the following areas: lands within the National Park System, the National Wildlife Refuge Systems, the National System of Trails, the National Wilderness Preservation System, the Wild and Scenic Rivers System; federal lands within a national forest; areas that would adversely affect public parks or places included in the National Register of Historic Sites; areas within one hundred feet of the outside right-of-way line of any public road; and areas within three hundred feet of any occupied dwelling, public building, school, church, community, or institutional building, or within one hundred feet of a cemetery. *See* 30 U.S.C. § 1272(e).

§ 1272(e). In this appeal, we are asked to determine how Congress intended that ban to work. The relevant text of § 522(e) provides: "After August 3, 1977, and subject to *valid existing rights* no surface coal mining operations except those which exist on August 3, 1977, shall be permitted [in the statutorily designated areas]." *Id.* (emphasis added).

Because one must show "valid existing rights" ("VER") to start a surface mining operation in a § 522(e) area, the meaning of the phrase is critical. For decades, the Secretary and the courts have wrestled with how best to understand VER and determine what it protects. We need not recount this history. Suffice it to say that VER has occasioned a spectrum of agency interpretations, ranging from a relaxed "ownership and authority" standard, which required only that the miner show a property right in the coal, to a more exacting "all permits" standard, which called for a showing that surface mining licenses had been issued prior to the date § 522(e) took effect. *See* Valid Existing Rights, 64 Fed. Reg. 70,766, 70,769–71 (Dec. 17, 1999) (recounting Secretary's prior definitions of VER).

In 1999, the Secretary and the Office of Surface Mining Reclamation and Enforcement promulgated a rule through notice-and-comment procedures offering yet another interpretation of VER. *Id.* at 70,831–32 (codified at 30 C.F.R. § 761.5). This "1999 Rule," as we will call it, was a setback for parties hoping to conduct new surface mining operations in § 522(e) areas. Under the 1999 Rule, a miner claiming VER protection must satisfy two conditions. First, he must produce a legally binding document that vested him with the right to mine the land at the time it came under § 522(e). Second, he must either prove that the owner of the land, by the time it came under § 522(e), had made a good faith effort to obtain all necessary permits for the mining, or else prove

that the coal is immediately adjacent to a surface mining operation in existence on August 3, 1977 and is needed to ensure the economic viability of the mining operation as a whole. The Secretary prefaced this interpretation of VER with a 72-page preamble describing the agency's long relationship with the phrase, explaining the rationale for the latest interpretation, and responding to objections raised during the notice-and-comment period. Significantly, the preamble acknowledges that the chosen VER interpretation protects 3,062 more acres than the least restrictive alternative and predicts that "few persons will qualify for VER under this standard." Valid Existing Rights, 64 Fed. Reg. 70,766, 70,776, 70,778 (Dec. 17, 1999).

The National Mining Association ("NMA"), an industry trade association with standing to bring suit on behalf of its members under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), challenged the 1999 Rule pursuant to 30 U.S.C. § 1276(a)(1) in the United States District Court for the District of Columbia. The NMA argued that the 1999 Rule's interpretation of VER was too narrow and shielded more land from surface mining than Congress intended. On cross-motions for summary judgment, the district court found the statute ambiguous, deferred to the Secretary's interpretation as reasonable, and entered judgment for the Secretary. *Nat'l Mining Ass'n v. Scarlett*, 2006 WL 1194224, *6–9 (D.D.C. May 4, 2006) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). The NMA appeals. For the reasons set forth below, we affirm the district court's judgment.

## II.

This case begins with an unusual question created by a mistake in the language of the jurisdictional grant. We have

an "independent obligation to determine whether subject-matter jurisdiction exists," *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006), which we must discharge before ruling on the merits, *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998)).

The district court claimed jurisdiction under 30 U.S.C. § 1276(a)(1), which renders "[a]ny action by the Secretary promulgating national rules or regulations . . . subject to judicial review in the United States District Court for the District of Columbia Circuit." But there is no such court within the federal judiciary. The judgment the NMA has asked us to review comes from a court called "the United States District Court for the District of Columbia." *See* Act of June 25, 1948, ch. 646, 62 Stat. 869, 875, 895 (codified at 28 U.S.C. §§ 88, 132(a)); *see also In re Permanent Surface Mining Regulation Litig.*, 653 F.2d 514, 516 n.2 (D.C. Cir. 1981) (noting § 1276(a)(1)'s error); *In re Surface Mining Regulation Litig.*, 627 F.2d 1346, 1350 n.1 (D.C. Cir. 1980) (same). Because the inferior federal courts are "creatures of statute," *Bath County v. Amy*, 80 U.S. (13 Wall.) 244, 247–48 (1871), we must pay careful attention to the legislative texts by which we are given authority. The district court did not address the mistake in the statute, so the task falls to us.

"[C]ourts will not give independent meaning to a word where it is apparent from the context of the act that the word is surplusage," *Am. Radio Relay League, Inc. v. FCC*, 617 F.2d 875, 879 (D.C. Cir. 1980) (citation and quotation marks omitted), so we will excise the word "Circuit" from the text of § 1276(a)(1). We have no qualms about this erasure, for both Congress's intent and the error impeding it are plain to see. *See* 2A NORMAN J. SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47.37 (6th ed. 2002) ("A

majority of the cases permit the elimination or disregarding of words in a statute in order to carry out the legislative intent or meaning."); HENRY M. HART, JR. & ALBERT M. SACKS, THE LEGAL PROCESS 1375 (William N. Eskridge, Jr. & Philip P. Frickey eds., 1994) ("Courts on occasion can correct mistakes . . . when it is completely clear from the context that a mistake has been made."). In § 1276(a), Congress subjected the Secretary's behavior to judicial review in various district courts. It would be absurd to assume that Congress intended to shield the Secretary's national rules against judicial review by granting jurisdiction to a nonexistent court. *Cf. Ethyl Corp. v. EPA*, 541 F.2d 1, 68 (D.C. Cir. 1976) (en banc) (Leventhal, J., concurring) ("Congress has been willing to delegate its legislative powers broadly and courts have upheld such delegation because there is court review to assure that the agency exercises the delegated power within statutory limits . . . ."). We read § 1276(a)(1) as granting jurisdiction to the United States District Court for the District of Columbia in the present case, notwithstanding Congress's erroneous inclusion of the word "Circuit." Our jurisdiction to review the final decision of that court comes from 28 U.S.C. § 1291.

## III.

We review de novo the district court's grant of summary judgment. *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 756 (D.C. Cir. 2003). Because Congress has charged the Secretary with implementing the SMCRA, we review the agency's interpretation of the statutory phrase "valid existing rights" under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003) (applying *Chevron* to Secretary's interpretation of the SMCRA). Where the statute is ambiguous, we defer to the agency's reasonable interpretation of its meaning. By contrast, a clear expression

of congressional intent will bind agency and court alike. *Chevron*, 467 U.S. at 842–43.

The NMA urges that Congress inserted VER in § 522(e) to protect mineral owners' property rights. As the NMA tells it, VER allows surface mining by those with a property right to mine coal. Were this true, the Secretary's restrictive interpretation of VER in the 1999 Rule would violate a congressional directive, and we would be required to set it aside. But we do not read the statute so narrowly. Since 1977, VER has been interpreted by five different Administrations, each of which has found within its borders the room to establish a preferred policy. The NMA takes this history to mean that the agency's current policy is entitled to less deference because it has changed over time, but the opposite is true. That Congress presented so wide a range of plausible interpretations to an agency with rulemaking authority shows a delegation to the executive branch of the power to make reasonable adjustments to the nation's surface mining policy.

**A.**

Our *Chevron* analysis begins with asking whether Congress has delegated authority to an agency by leaving a statutory gap for the agency to fill. 467 U.S. at 843–44 (citing *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). Our reading of the SMCRA's language convinces us that VER is an ambiguous phrase.[2] We have in the past determined that the phrase is

---

[2] We have noted that the legislative history of the SMCRA does not illuminate the meaning of VER. *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 749 (D.C. Cir. 1988); *cf. Bank One Chi., N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 283 (1996) (Scalia, J., concurring) ("The text's the thing. We should therefore ignore drafting history without discussing it, instead of after discussing it.").

subject to multiple and divergent interpretations. *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 748–51 (D.C. Cir. 1988) (noting the ambiguity inherent in VER and deferring to the Secretary's reasonable interpretation of the phrase as encompassing so-called "continually-created valid existing rights").

The major source of VER's ambiguity is the word "rights." The NMA, reaching for its dictionary, notes that the word "right" could be taken to mean "property right." *See* Appellant's Br. at 34 (interpreting "rights" to mean " 'an interest or title in an object of property' ") (quoting BLACK'S LAW DICTIONARY 1324 (6th ed. 1990)); *see also* BLACK'S LAW DICTIONARY 1347 (8th ed. 2004) (defining "right" as, *inter alia*, an "interest, claim, or ownership that one has in tangible or intangible property"). But according to the same dictionary on which the NMA relies, this is not the only meaning the word will bear. BLACK'S LAW DICTIONARY 1324 (6th ed. 1990) (defining "right" as, *inter alia*, "[a] legally enforceable claim of one person against another, that the other shall do a given act, or shall not do a given act"); *see also* BLACK'S LAW DICTIONARY 1347 (8th ed. 2004) (defining "right" as, *inter alia*, "[a] legally enforceable claim that another will do or will not do a given act"). In fact, this definition cuts against the NMA's proposed interpretation of VER because it is not tied in all circumstances to property.

Just as "right" can function as a proxy for property rights, it will also do service more generally. *See, e.g.*, *id.* ("[s]omething that is due to a person by just claim, legal guarantee, or moral principle"); 13 THE OXFORD ENGLISH DICTIONARY 923 (2d ed. 1989) ("[j]ustifiable claim, on moral or legal grounds, to have or obtain something, or to act in a certain way"); WEBSTER'S NEW INTERNATIONAL DICTIONARY 2147 (2d ed. 1952) ("[t]hat to which one has a just claim").

Under *Chevron*, we ask "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. By using a word with multiple and often vague meanings, it is hard for us to conclude that Congress has done that here. The word "right," instead of answering a question, unhelpfully asks another one: To what is a person legally entitled? Similarly, "valid" could mean "[l]egally sufficient," BLACK'S LAW DICTIONARY 1586 (8th ed. 2004), which is equally unhelpful because it requires yet another question: Under law, what makes a miner's rights sufficient? The dictionary counsels in favor of more deference to the agency, not less. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 (2005) ("[W]here a statute's plain terms admit of two or more reasonable ordinary usages, the [agency's] choice of one of them is entitled to deference."); *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 418 (1992) ("The existence of alternative dictionary definitions of the word 'required,' each making some sense under the statute, itself indicates that the statute is open to interpretation.") (citation omitted); *AFL-CIO v. FEC*, 333 F.3d 168, 174 (D.C. Cir. 2003) ("[T]he fact that the provision can support two plausible interpretations renders it ambiguous for purposes of *Chevron* analysis.") (citation omitted).

VER could be read, as the NMA suggests, as protecting "valid existing *property* rights." But it could also encompass a narrower protection, as in the 1999 Rule. Nothing in § 522(e) suggests Congress intended to enact the former understanding over the latter. This case is thus the reverse of *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140 (D.C. Cir. 2006). In *Friends of the Earth*, we found that Congress's use of the word "daily" to modify the phrase "total maximum loads" removed any ambiguity that otherwise existed. *See* 446 F.3d at 144 ("[B]y providing for the establishment of 'total maximum loads,' Congress could have left a gap for EPA to fill. Instead,

Congress specified 'total maximum *daily* loads.' "). In § 522(e), by contrast, Congress enacted the ambiguous "valid existing rights" instead of the more precise "valid existing property rights." If VER operates as a "term of art," as the NMA suggests, it is as a tool by which Congress delegates policymaking authority through ambiguity.[3] *See, e.g.*, *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1345 (9th Cir. 1990) (noting the Secretary's interpretation of VER in 43 U.S.C. §§ 1701–1782); *Alekganik Natives Ltd. v. United States*, 806 F.2d 924, 926 (9th Cir. 1986) (noting the Secretary's interpretation of VER in 43 U.S.C. § 1610(a)(1)); *United States v. Garfield County*, 122 F. Supp. 2d 1201, 1235–36 (D. Utah 2000) (noting Park Service's interpretation of VER in 16 U.S.C. § 273(a)); *cf.* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 545 (1947) (noting "a recent cartoon in which a senator tells his colleagues 'I admit this new bill is too complicated to understand. We'll just have to pass it to find out what it means.' ").

---

[3] Academic commentary supports our reading of VER. We note that the *Journal of Mineral Law & Policy*, a publication of the University of Kentucky College of Law, dedicated an entire issue to analysis of VER as used in the SMCRA. *See generally Valid Existing Rights Symposium*, 5 J. MIN. L. & POL'Y 381 *et seq.* (1990). Despite devoting 375 pages to the topic, the symposium participants reached no consensus on VER's meaning. As stated by Professor Laitos, in whom the NMA's briefing places great faith: "Typically, Congress never lists what interests it means to include within the 'valid existing rights' phrase. The task of interpretation thus falls on the executive branch (*i.e.*, the Department of Interior) or the courts." Jan G. Laitos & Richard A. Westfall, *Government Interference with Private Interests in Public Resources*, 11 HARV. ENVTL. L. REV. 1, 19 (1987). Of course, we cannot outsource the task of statutory interpretation to the professoriate, but we find it illuminating that scholars with expertise in this area have been similarly unable to distill a single, clear meaning from VER.

Of course, not every statutory ambiguity gives rise to agency prerogative. *See Gonzales v. Oregon*, 546 U.S. 243, 258 (2006); *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998). But where Congress has indicated that it "would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law," *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001), its decision to leave "a gap for an agency to fill . . . is a delegation of authority to the agency to give meaning to a specific provision of the statute by regulation," *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001). So it is in this case. *See* 30 U.S.C. § 1211(c)(2) (empowering the Secretary to "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of [the SMCRA]"); *Mead*, 533 U.S. at 229 ("We have recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed."). It remains for us to determine whether the Secretary served as Congress's faithful agent in giving meaning to VER's ambiguities.

**B.**

Having satisfied ourselves that VER is ambiguous, we defer to the Secretary's interpretation of the phrase if it "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. All we ask of the agency is a reasonable interpretation. *See Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007); *Citizens Coal Council v. Norton*, 330 F.3d 478, 483 (D.C. Cir. 2003). By "consider[ing] the matter in a detailed and reasoned fashion" and demonstrating in its 72-page preamble that "the interpretation is arguably

consistent with the underlying statutory scheme in a substantive sense," we conclude that the Secretary has adopted a reasonable interpretation of the statute. *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1206 (D.C. Cir. 1996).[4]

The 1999 Rule remains true to the authority delegated to the Secretary in the SMCRA by protecting against the harmful effects of surface mining that Congress sought to ameliorate. Providing this protection is the primary aim of the statute. *See* 30 U.S.C. § 1201(e) (declaring that regulation of surface coal mining "is an appropriate and necessary means to minimize so far as practicable the adverse social, economic, and environmental effects of such mining operations"); *id.* § 1201(c), (k) (warning of deleterious effects of surface coal mining); *id.* § 1202(a) (stating that a purpose of the SMCRA is to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations"); *id.* § 1202(f) (stating that a purpose of the SMCRA is to "strike a balance between protection of the environment . . . and the Nation's need for coal as an essential source of energy"). Therefore it is not surprising that the Secretary has promulgated an interpretive rule that cuts against the interests of some miners.

The NMA's suggestion that the SMCRA effected robust protection of miners' property rights is belied by the way

---

[4] Given the overlap between step-two *Chevron* review and the arbitrary-and-capricious review called for by § 1276(a)(1) and the APA, *see Shays v. FEC*, 414 F.3d 76, 96–97 (D.C. Cir. 2005) (collecting cases), the contention that the 1999 Rule violates § 1276(a)(1) fails for similar reasons. In the preamble to the 1999 Rule, the Secretary "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Congress used the word "property" in that statute. Of the twenty-nine instances in which "property" appears, only one refers to protecting the property rights of subsurface owners of the mineral estate. *Id.* § 1304(g) (concerning coal owned by the United States). Many uses of "property" concern the protection of surface or adjacent property owners *against* the harmful effects of surface mining, *id.* §§ 1201(c), 1233(a)(1)(A), 1239(a), 1253(a)(15)(C), 1253(a)(17), 1257(f), 1269(a), 1270(f), 1272(a)(3)(D), 1307(b), and several mentions of "property" run counter to miners' property rights, in that they authorize government entry onto mined property to assess and remedy environmental degradation caused by strip mining, *id.* §§ 1237(a), 1237(b), 1240(b).

Save for repeating its argument that VER is unambiguous and accusing the Secretary of "flip-flopping," Appellant's Br. at 53, the NMA provides little resistance on this front.[5] With the exception of the constitutional avoidance argument, discussed next, the NMA offers no basis for finding the Secretary's interpretation unreasonable. If that argument fails, we must accord *Chevron* deference to the 1999 Rule. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 299 (D.C. Cir. 2003) ("Here, however, [petitioner] advances no additional argument beyond those already discussed as part of step one, and so we have no basis for finding the Commission's interpretation unreasonable. In any event, the language of [the statute] plainly admits of the Commission's interpretation, and it therefore is a permissible construction of the statute.").

The NMA asserts that the 1999 Rule runs afoul of both the Due Process and Takings Clauses of the Fifth

---

[5] The NMA's "flip-flopping" point ignores the agency's obligation to "consider varying interpretations and the wisdom of its policy on a continuing basis," *Chevron*, 467 U.S. at 863–64.

Amendment, an argument raised to invoke the canon of constitutional avoidance. Because the judiciary must rightly presume that Congress acts consistent with its duty to uphold the Constitution, courts make every effort to construe statutes so as to find their constitutional foundations and thus avoid needless constitutional confrontations. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring). This canon of constitutional avoidance trumps *Chevron* deference, *see DeBartolo*, 485 U.S. at 574–77, and we will not submit to an agency's interpretation of a statute if it "presents serious constitutional difficulties," *Chamber of Commerce v. FEC*, 69 F.3d 600, 605 (D.C. Cir. 1995). But we do not abandon *Chevron* deference at the mere mention of a possible constitutional problem; the argument must be serious. *See Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 409 (D.C. Cir. 1996). The NMA's arguments are not.

Though its briefs are unclear, the NMA appears to argue that its procedural due process rights were violated because the 1999 Rule created no mechanism by which miners could comply with the good-faith permitting requirement had they not already done so by August 3, 1977. The NMA argues that *United States v. Locke*, 471 U.S. 84, 108 (1985), and *Texaco, Inc. v. Short*, 454 U.S. 516, 531–32 (1982), require such a mechanism. But those cases dealt with a different type of legislative determination than we have here. In both *Locke* and *Texaco*, a legislature addressed a dispute over dormant mines by creating a process that would allow miners to protect their claims. The issue in those cases was whether claimants had been improperly denied their rights to make their claims. In § 522(e), Congress chose a different means to address a problem: It prohibited new surface mining in sensitive areas for all but those who could show a valid

existing right to mine the land. Congress created no process by which to abide, no regulatory regime with which to comply. It simply declared surface mining off limits for those who had no valid existing rights. Congress created no process that the NMA can successfully argue it was denied.

The NMA also argues that the 1999 Rule precludes *Chevron* deference by working a taking of subsurface coal interests. A taking, however, is only unconstitutional if the government fails to pay just compensation, and the Tucker Act provides for such a remedy. *See* 28 U.S.C. § 1491(a). Miners can pursue their takings claims in the United States Court of Federal Claims ("Claims Court"). Given this protection, the NMA's takings challenge raises no serious question about the 1999 Rule that would preclude *Chevron* deference. *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 127–28 (1985); *Ry. Labor Executives' Ass'n v. United States*, 987 F.2d 806, 816 (D.C. Cir. 1993) (per curiam).

This is not to say that the canon of constitutional avoidance can be ignored with respect to every argument sounding in the Takings Clause. The Supreme Court has recognized that the Claims Court is not a proper venue if a statute creates "an identifiable class of cases in which application of [the] statute will necessarily constitute a taking." *Riverside Bayview*, 474 U.S. at 128 n.5 (construing *United States v. Sec. Indus. Bank*, 459 U.S. 70, 78 (1982)). Likewise, we have refused *Chevron* deference to an agency interpretation that created an "identifiable class" of takings victims. *See Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1445 (D.C. Cir. 1994) (noting that "*Chevron* deference to agency action that creates a broad class of takings claims, compensable in the Court of Claims, would allow agencies to use statutory silence or ambiguity to expose the Treasury to

liability both massive and unforeseen," which would impinge Article I authority). But the NMA has shown no "identifiable class" of miners whose takings claims would expose the Treasury to such liability. At oral argument, the NMA did not claim that the government would be on the hook for a "massive and unforeseen" sum, paid out to frustrated miners as just compensation. *See* Oral Arg. Recording at 14:45–17:52. The record is devoid of evidence suggesting it is so. Given this implicit concession that the 1999 Rule will have relatively insignificant takings implications that can be readily addressed in the Claims Court, there is no serious constitutional problem to be avoided. "[T]he avoidance canon is not applicable when the statute or regulation would effect a taking, if at all, only in certain situations." *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 917 (D.C. Cir. 1999). The usual *Chevron* analysis is therefore applied to the 1999 Rule, which results in our deferring to the Secretary's reasonable interpretation of an ambiguous statutory term.

## IV.

The district court properly accorded *Chevron* deference to the Secretary's interpretative rule. The judgment is

*Affirmed.*